This video is a derivative work of the Council on Violence Against Women. No part of this recording may be reproduced without Mooji Media Ltd.'s express consent. This video is a derivative work of the Council on Violence Against Women.  You may proceed, Mr. Hurst. Thank you. May it please the Court, Jim Hurst on behalf of Hospira. I'm going to use my opening segment of eight minutes to address our affirmative appeal on the 071 patent. This is not the kind of case that a certificate of correction was designed to address. Cubist, in its claims, deliberately defined its claimed compound through its stereochemistry. After telling the patent office during prosecution that it is important, quote, to use exact, quote, exact stereochemistry when designing compounds. Cubist could have avoided relying on stereochemistry, which they tell us now is subject to change, by using a product by process claim. But that would have given them more narrow coverage, because infringement would have required using that process. So they went broad, and they deliberately defined their compound with its stereochemistry. Given that context, this is not the kind of situation that we can call a minor change. It effectively swaps one compound for another. Under the legal standard... Would it matter, in your view, if the L stereoisomer didn't exist? And the only stereoisomer found in nature or had ever been created was the D isomer. I think, as a matter of chemistry, that's probably not possible. But let's assume it is in the hypothetical world. It was an impossibility, and it was apparent to one of ordinary skill in the art. I guess, yes, I think that might make a difference if it was apparent error. But that's not what we have here. We have a situation where... Each new territory with your corrected claim, the certificate of correction is invalid. And in this particular case, that's what we have if you look at the claims from the proper perspective. The proper perspective is you construe the original claims, and you compare it to the corrected claims. What's the proper perspective? A 1987 person of ordinary skill in the art. You basically take yourself into a time machine. You go back to 87, and you say, how would one construe this claim that expressly references LASN? What that person of ordinary skill in the art would know is that you can make this claim compound one of two ways from the spec. Semi-synthesis or fermentation. No 1987 person of ordinary skill in the art would have ever imagined that that claim would reach the DASN version of this molecule made semi-synthetically. And yet, Cubist tells us in their briefs that the corrected claims cover DASN made semi-synthetically. That's new territory. That's broadening. That means the certificate of correction is incorrect, is invalid. Cubist really does offer a results-oriented analysis. Think of it this way. Say it turned out that the LASN molecule was the better antibiotic. Cubist could have stuck with his original claims and enforced them against the LASN molecule, which is justifiably so, which is expressly recited in the claims. And enabled through semi-synthesis. But it turned out that the DASN molecule is better. And therefore, they got themselves a certificate of correction that swapped compounds to the better antibiotic. They're both antibiotics. I think they're not going to concede. I would imagine that your hypothetical would be true. Because I think what they would say is, well, no, they couldn't have the LASN because they had already committed themselves to something that was widely understood to be daptomycin. Which, as it ultimately turns out, was the D stereoisomer, not the L. And therefore, they were stuck with daptomycin, notwithstanding the error in the structural description. Well, think of it. I think that's not correct. And this is why I say so. The only reason they're even arguing about DASN now is because they corrected the claim. If they stuck with the original claim, what's the question? What does the claim cover? Well, it expressly covers LASN. And what's the next question? Does the SPAC enable it? It does enable it. They could have justifiably stuck with that original claim and enforced it against folks out there using LASN if it turned out to be the better antibiotic. Well, I don't want to beat this to death, but it seems to me that you can have, in the history of chemistry, there have been a lot of mistakes as to how things actually work and what their actual structure is. I mean, suppose somebody, just to take a really silly kind of chemical example, if somebody is describing sulfuric acid and they make it very clear that they are describing what every chemist understands to be sulfuric acid, and they say, which has the structure H2SO3? It seems to me that is, as long as we know it's sulfuric acid, the fact that you've described it incorrectly is a minor mistake. It depends on the context, right? Right, but the question is, is this context one of those contexts in which it's so clear from the rest of the specification that they were claiming daptomycin, which is, as it turns out, in effect, H2SO4 or the D stereoisomer. Isn't that the same? The answer is it's the way they chose to claim their compound. They chose to claim a brand. This isn't that sulfuric acid where it's been around forever. This is a new compound, and they had a choice. They could have said, product by process, if they had any doubts about its stereochemistry, and that would have protected them, and that would have given them more narrow coverage. They made a deliberate choice, let's go with stereochemistry. And remember the legal standard? The legal standard is how would you construe this claim back in 1987? The only way the district court construed the original claim to cover DASN is as follows. The district court said there's an ambiguity in the claims, right? He sees the reference to A21978C and says, well, that refers to the fermentation product, and that must be DASN. The mistake that we believe the district court made is that's after acquired knowledge from 2001. People only learned that in 2001. Put yourself in my time machine. In 1987, that claim itself teaches that LASN is, in fact, within the family of peptides A21978C. So that's what a person in 1987 would have concluded, and it's really undisputed in the record. We asked our expert about it. There's nothing that anybody would have known in 1987 to lead them to the conclusion that that claim covered DASN. And I'm running into my rebuttal time now, so if there's any further questions. Thank you, Your Honors. Mr. Lee? Thank you, Your Honor. May it please the Court, my name is Bill Lee, and together with my partner, Lisa Carazzolo, I represent QBIS. Mr. Lee, let me cut to the chase where I'm interested. Sure. And that is, a couple of times, Hesperia goes after you for the Orange Book delisting. Sure. Tell me why it was delisted. Absolutely, Your Honor. As Your Honor knows, the Hatch-Waxman area is what I would call a litigation-rich environment. Everybody asserts every claim that they can assert. It's patent claims, it's equitable conduct claims, it's antitrust claims, as Your Honor knows. When the error was discovered, and to be clear on one thing, to go to Judge Bryson's question, at the time this invention was made and the application was filed, the only naturally occurring compound was D-asparagine. There was no naturally occurring L-asparagine. There's no dispute about that. In fact, the semi-synthetic one wasn't made until years later. When we discovered in 2007, knowing that there was a lot of litigation, a lot of claims, we took the cautious step of saying, look, while it's being corrected, we've asked for it to be corrected, but until it is, we're going to take the conservative step of not listing it. As soon as it was corrected, after we went through the process with the Patent Office, we listed it immediately. On this issue, Your Honor, and I was using my time to do two things. One is to address this issue, but two, to address four legal errors that the district court made that resulted in the invalidation of four patents. To be clear, these are four patents, particularly two of them. Without these patents, there are thousands and thousands of people who never would have been successfully treated and hundreds of lives that were saved because there was no product on the market. Let me answer on the reissue first. Here's what the district court did, and it's not quite what Mr. Hurst represented. He heard from two experts, Dr. Gerwick and Dr. Gammon. Dr. Gammon is their expert, and we would ask the court to consider his testimony that begins in 8359 because he gave his opinion without ever reading the specification of the patent, literally without reading the specification of the patent. As a consequence, there is no rebuttal to what Dr. Gerwick said and equally important to what the district court found, which is that daptomycin, the compound, was described in four separate ways. It was described as A21978C, as Mr. Hurst said, not a term of art in the field. That distinguishes the Barakas. It was described as LY146032, not a term of art in the field. Then at column 7, line 41 to 60, it was described by the process by which this natural compound was made with reference to two other patents. It's a fermentation process that results in daptomycin. To go to Judge Bryson's question, it results in the D asparagine, and there's no dispute about that. Then there is the structural diagram with the L asparagine. You say the LY, I forget the numbers, 15620, was not a term used in the art, but it was at least a term used in Lilly's labs, correct, for what we now know to be the D asparagine. Yes, and in fact, Your Honor, it was a term used, and the specification makes this clear. In both, Mr. Hurst and I had to sort of look down to read the numbers. Both the cyclic peptide and the LY146032 are described in the specification at column 7, line 41 to 60, as a result of the fermentation process that produces the natural product. Then there is, without a doubt, there is the fourth way of describing it, which is the structural diagram. What the district court correctly concluded is, one of ordinary skill in the art would look at the claim and the path. They would see the diagram, but they would also see the reference to the cyclic peptide. They would read the specification, which is what Dr. Gammon didn't do. You alluded briefly to the Beyer case. Yes. Could you expand on that? Sure. It seemed to me that you characterized it in your brief as being the polar opposite of this case, and it seemed to me it's a lot closer than that. It may be distinguishable, but I'd like to hear what your response to it is. I think, Your Honor, if we characterize it as the polar opposite… I may have added the word polar. I think you said opposite. We intended to describe it as distinguishable. In Beyer, they selected a word that had a common meaning to those of ordinary skill in the art. Then, the claim construction, they tried to reverse field and say, no, that's not what we intended. The difference here is, and this is in the claim. This isn't just the LY, which is the spec. Here, we put in A21978C literally into the claim. The specification tells you exactly what that is. It's the fermentation process that results from this process. There is no dispute today that, in fact, it's deasparaging. Are you saying that if you had left out the LY from the claim, and all that had been in the claim had been the structure, then you would be on all fours with Beyer? Your Honor, I could take it in three different boxes. At the extreme, which I think is maybe the hypothetical you're asking me, if all the claim referred to was the formula three structure, and there was nothing in the specification… No, no, the spec is loaded with indications that it's supposed to be daptomycin, but the only thing in the claim is the… Because I think in Beyer, that was the situation, if I recall correctly. I think it's close to the situation. They actually used the word in the claim. I think, Your Honor, if we take the three buckets… My three buckets would be the one that we are confronted with, which is it's in the claim, and you have to go to the spec to get it defined. I think that combination of the specification and what's in the claim is what the district court correctly relied upon. I think if you go to, I think, a middle box, which may be where Your Honor is, which is it's got the formula three, but everything in the spec talks about it being the result of a fermentation process. I think you would still have an issue to resolve, and the district court would take testimony the way they took to determine how one of OrgA's skill in the art would have viewed it at the time. I think the extreme would be just formula three and nothing in the spec, and that would be a problem. That would be pretty easy. That would be a problem. But do you think Bayer is more in that category than in the middle category? No, I think the distinction between Bayer, whether polar opposite or not, I think the distinction of Bayer is the term that was focused on in Bayer had a meaning to those of OrgA's skill in the art, and the cyclic peptide does not. If I could turn to RPL and the four errors, in the interest of time, let me describe what they are, because they are important, and they're each… Could I maybe direct you because it's the one that's troubling me the most, and that's the obviousness finding on the high purity. This product by process stuff I find difficult, but it seems to me that the district court found that at least the purification processes were obvious, and it doesn't seem that you dispute that all that much. What you dispute, I think, is that the ultimate product obtained by those processes is not obvious, but I don't really follow that, because at least in these cases it seems like it would always be obvious to try to get a more pure form of the drug. Your Honor, it might be obvious to try to get a more pure form of the drug, but let me answer your question in these two parts, and I'd like to address both of them. I think the second part will go most directly to Your Honor's question, because there's an anticipation finding and an obviousness finding. Let me just say this on the anticipation finding. The anticipation finding relies upon prior art that's not prior art. I mean, literally. We have an opinion that says, I'm relying upon this whole piece of prior art, the 843 FET. The compounds are different. I know they're different. So what am I going to do? I'm going to rely upon these clinical trial life plots with no provenance. No one knows where they came from, how they were made. And we don't have any indication that that chemical was the LILI-483 that was produced by the process. There was no evidence it was produced by the 843 FET. 843? Yeah, 843. There are a lot of numbers flying around. There's no evidence it was made by the 843. And probably, I think, to go to part of Judge Hughes' question, because they're related, Your Honor, the lots actually, if you go to and we cite it to you, literally the record says we don't know how these lots were made. I mean, literally, that's what's in the NDA to the FDA. So what happened is there was a hole, and there was a hole because the products that are made by the 843 FET are different than the products made by the product that process claims. And I start there, Your Honor, because they're related. So if you start with that FET, and, in fact, the district court found that the products made by the 843 FET are different. So just, I think you're going where I want, but to clarify, I assume I agree with you that that anticipation finding is not correct because it doesn't cover everything. What would you need to add to an 843 patent to get to your patent? Well, Your Honor, to get to the high purity patents, I think this would be the analytical framework. First, there's a question, since they're product-by-process claims, are the products different? And the district court of FET found that they were. He found that the patent itself said, as to endotoxins, they're different. He found, as a matter of fact, that as to FETs... Okay, I think I see it. So, again, the 843 patents produce a different product. We can start with that. But if it's obvious to add in this other purification process that will get you to your product, why isn't that still a sufficient obviousness finding? Your Honor, there are three reasons. And the first is this. It has to be a combination of, and we don't concede that the implementation was quite as common as they say, but you have to... The analytical framework requires that you combine them to get what is claimed, not just say A was out there, B was out there, to get what was claimed. So, if I could give you, Your Honor, I think one that will help answer the framework question. Consider claim 187 of the high purity patents. It claims 97% purity. You will search the district court's opinion in vain to find anything that says, take A, take B. Take micelle aggregation and take dynex gene chromatography. Combine them, and there's a reasonable expectation that you get to 97. Now, Your Honor, that's the difference I tried to make at the outset between, yeah, you'd also like to get more pure. That's not the question. The question is, do we have a reasonable expectation of getting there? And the problems, the three boxes I was going to try to put this in, the products are different. So, if I take that and set it aside. Now, you have these two purification processes, and the reason we don't even concede there is if you look at what the district court did, it said, well, micelle filtration was known. Then, there's a problem because you get to the dynex gene chromatography, and the prior art they're looking at is the 843 patent. And the 843 patent says ion exchange chromatography for gap to micelle is a bad idea. So, what does the district court rely upon to reach the obviousness determination? It relies upon the disclosure of the patent. So, what you have is you have setting aside anticipation. You have the foundation of the obviousness inquiry, which is the products are different. You then have a real question of whether there's a legal error because taking the two techniques, whether the district court, in fact, used the patent itself to supply the information on the second. So, you know you're well into your rebuttal time. Let me just add one sentence. Whatever you want. I'm not going to give follow-ups. Let me just add one sentence. On the dosing test, two sentences. One is it's very important that you read the reference as a whole. I'm talking about Woodworth. Woodworth. And the reference says nothing about dosing interval. It says nothing about skeletal muscle toxicity. And the most critical fact is there are a group of doses that are disclosed. Those doses, in fact, in fact, as a matter of what occurred, those doses were what caused the skeletal muscle toxicity issue that led to the product being taken off the market. I'll reserve the last minute. I quit, Your Honor. Let me just quickly address some questions from the 071 patent. Judge Wallach, to address your question, under the law, the only reason that patent should have been removed from the Orange Book is if it did not cover the DASN molecule and it was removed. Second, Judge Bryson, in response to one of your questions, I think Mr. Lee pointed out that the LASN molecule is not naturally occurring. The claims are not limited to naturally occurring antibiotics. In fact, if you look at the claim itself, it is a pure, here's the structure of the compound that we are now claiming. And basically, the argument is let's convert that compound claim into a product by process claim. They could have done that before. It would have limited the scope of their patent coverage. I think what he was responding to was that at that time, for all practical purposes, this case was like my hypothetical case in which the second recited, the actually recited structure didn't exist. Well, that's not true. That's not true at all. It didn't exist at that time. I mean, it was possible to create it, but it didn't exist. No different than any other patent that claims compounds where the compounds are enabled, and this one was enabled through semi-synthesis, and it was claimed as a stereoisomer. The question is, how would someone have reviewed this claim in 1987? You have to apply Markman principles to look at the original claim and compare it to the next claim. How do you get, in 1987, when you look at this particular compound, it's written out as a structure. How do you, as a judge, say, you know what, I think I'm going to replace the L with a D? In 1987, you would never have done that, and that invalidates the certificate. The only reference in the claim, Your Honor, to anything that supports the notion that this would be unknowingly DASM is this reference to A21978C, which is talked about as a fermentation product. But, Your Honor, back in 1987, remember, you're limited to the patent records. You're not going into Eli Lilly's notebooks in the laboratory. You're not looking at clinical trials and what they're actually physically giving. You're looking at the patent record, and that reference to the family of cyclic peptides, that would have included LASN to any person of ordinary skill in the art as of 1987, when we go back in our time machine. Let me address the purity patents. Mr. Lee is re-arguing the facts. The district court, these are product by process claims. The district court found unchallenged finding that the underlying processes were obvious. But where's the finding that the actual product claims are obvious, that the specific purity levels claimed by the various claims? Because I don't find that. It seems to me that it may follow somewhat logically that if you apply obvious purification principles to this, you get better products. But doesn't our case law actually require that the products themselves be obvious? The district court was addressing the argument that Cubis made. Cubis below said the reason my patents aren't valid is not because I got higher purity. If the ion exchange column is obvious and micelle filtration is obvious, both designed to increase purity, and the record included evidence that if you want to get high purity, all you do is run the material multiple times. But doesn't the law still require that they find that the products claimed and their specific purity levels be obvious? That is exactly what the district court did find. Remember, this is Cubis' argument. Cubis argued that the reason my patent is valid is because I produced structurally and functionally different material. The district court rejected that. I think your conversation with Mr. Lee suggested that there was a belief that it was different, that the products were different. Here's what the district court found on page 839. Daptomycin compositions purified pursuant to the Claim 98 process limitations, that's micelle filtration, are not structurally and functionally different from those taught by the 843 patent. He literally found there's no structural and functional difference. Next. The district court, here's what happened. Cubis has their material. They take the prior art material from the 843 Lilly patent. They send it out to an outside agency, an outside company, to do what that company always does, which is to purify proteins. You know what that company did? According to Mr. Lynch, the inventor himself, we just applied our standard process. And they ran it through an ion exchange column once. Judge Sleet found the use of an ion exchange column is obvious. He found that. It's not even challenged. By running the prior art material through a deemed obvious ion exchange column once, through an outside company that does this for a living, where the inventor said, I use my standard processes, the resulting material matches every limitation. But where is the prior art that said, if you use 843 in combination with these methods, you will get purity levels of 95 and 97 percent? The prior art, for instance, a beginner's textbook at A332122 says, you normally get complete purification of proteins in a short period of time. And you apply the standard tools to do that. Your Honor, the expectation is that these tools do what they're supposed to do. It's A3221-22. That's the beginner's textbook that says you normally get complete purification. But what does complete purification mean? Does it mean 93 percent or does it mean 95 percent? Does it mean 100 percent? Complete purification means, for all intents and purposes, you have the protein with some minor amounts of impurities. Remember, it's only 97 percent. It's not even a particularly high level that we're talking about here. Judges addressed the issues the other side raised. Mr. Lee, down below, never argued. You can look at the record. You can look at his sites. He never said, you know where my case lies? I don't think there was a reasonable expectation that you'd get up to 97 percent. Never. That wasn't the issue. The sole focus where they tried to save their patent was, my process creates a structurally and functionally different material. And the district court, in an unchallenged factual finding, rejected that. And that's mainly by virtue of the endotoxins. Say again? Mostly by virtue of the endotoxins, I take it. That what? I'm making a question. I mean, the argument was that the patents managed to eliminate endotoxins and the prior art systems. They said both saponins and endotoxins. Yes, but 843 takes care of the saponins, right? Yes. Sorry. So we're left with endotoxins. And companies have been, this is their expert witness, companies have been removing endotoxins for decades. That's A1053 to 54. That's a very standard thing you do with proteins. You eliminate the endotoxins and Judge Sleet specifically found you can do that with an ion exchange column. If you look at A26. Did you say you eliminate endotoxins with ion exchange? Or endotoxins with micelle filtration? I think the, well, you could probably do it. I thought it was the micelle. I thought the ion exchange would not work with endotoxins. It was the micelle filtration, right? You know, it's something I think actually both might work. And I'm not entirely positive about that because micelle filtration should work because it's size exclusion both ways. Size filtration as opposed to. Here's the actual finding. Even if one skilled in the art would have had to optimize other parameters. Whoops. Mr. Hirsch, you're going to have to wrap up. Can I read the last quote? Of course. Supponents could be removed using micelle filtration, which the court found obvious, as claimed in the purity patents or using the process taught by the 843 patent, prior art. After removing supponents, and that was the whole point of the 843 patent, one skilled in the art could apply the well-known ion exchange purification technique. The purity patents do not claim anything other than this simple concept. And we know that when you run it through once, you get material that meets each and every claim limitation. That was undisputed. I think 50. I'm over. Thank you, Your Honor. Give Mr. Lee an extra minute. In my couple minutes, three points. Judge Hughes, to go to your question, if you look at page A4048 of the appendix, you will find, actually in the pages surrounding it, you will find, contrary to what Mr. Hirsch just said, we specifically addressed the 187 claim. We specifically said that there was nothing that would show a combination of the prior art references get to 97%. We asked for that finding. That finding was never made one way or another. And as I said before, you could search the record forever and you won't find a claim by claim analysis. And at pages A407 to A409, you'll see we asked for it claim by claim. Second point, to go to Judge Bryson's question. Actually, Judge Bryson, I don't think that, I think where we would quarrel, I don't think the 843 takes care of saponin approval. If you look at A40. I thought you would disagree. Well, this is the place where I'm going to marry the district court judge. He said that Claim 98 provided for even better saponin removal than the process of the 843. So the patents themselves, the high-period patents, say we do better at endotoxins. Here's the data. And the district court found that saponins, they did better. But nonetheless, the district, as I recall, the district court said, basically the problem of the saponins was sufficiently solved by the 843 that you could then do ion exchange chromatography and then get the purification with respect to the analogs. Your Honor, but then this is a place, and I'm not retrying the case. I'm focusing on legal errors. And what he did to reach that conclusion is he relied upon the disclosure of the patent. I mean, you cannot find a hole for ion exchange chromatography. He said, I'm going to fill it in by referring to the spec. Last point in the 20 seconds that remain on Woodworth. The invention here was not about dosing. It was about interval. That was the key. There's nothing in Woodworth about interval. The invention was about multiple skeletal toxicity. Nothing in Woodworth about it. Talks about it once daily. Sure. Several times. Well, no, Your Honor, actually this is where it's important to read it. What it says at the end, it says four to six milligrams per kilogram without the day. Then the sentence that follows two after that says, and divided doses given the extended half-life is the right way to go. And then if you go back to the beginning, it does say four to six milligrams per kilogram per day, possibly in divided doses. The real question is you now have this universe. You have a group, genus, whatever you want to call it. Some of them, right, actually the majority of them, as you have been shown, caused the problem. Some of them don't. No one had any idea which they were. Eight years later, someone figured it out. Thank you.